Filed 12/10/20  J.M. v. Superior Court CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| J.M.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Respondent;<br><br>SAN FRANCISCO HUMAN SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | A161026<br><br>(City & County of San Francisco Super. Ct. No. JD183273) |

J.M. (Mother) petitions under rule 8.452 of the California Rules of Court to vacate the juvenile court's order setting a hearing under section 366.26 of the Welfare and Institutions Code to select a permanent plan for her daughter, minor Mia M. (Mia).[1]  Mother contends the court erred in finding that the San Francisco Human Services Agency (Agency) offered her reasonable reunification services.  Mother also contends the court erred in finding no substantial probability Mia would be returned within the 24-

---

[1]     All further rule references are to the California Rules of Court.  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

month review period.  Last, she claims the court abused its discretion by granting the Agency's section 388 motion to restrict visits to virtual visits, and by denying her competing section 388 motion for in-person visits.  We issued an order to show cause.  For the reasons discussed below, we now deny Mother's petition on its merits.

FACTUAL AND PROCEDURAL BACKGROUND

## A.  Petition, Jurisdiction, and Disposition

In December 2018, the Agency filed the operative dependency petition concerning Mia, who was then two years old.  The petition alleged, pursuant to section 300, subdivision (b) ("300(b)"), Mother's willful or negligent failure to provide the child with adequate food, clothing, shelter, or medical treatment; Mother's inability to provide her with regular care due to Mother's mental illness, developmental disability, or substance abuse; and that the child suffered or there was a substantial risk she would suffer serious harm or illness due to Mother's inability to adequately supervise or protect her.  The petition additionally alleged, pursuant to section 300, subdivision (g), that it was unknown if the child's father was able to care or provide for her.  The Agency's detention report indicated the section 300(b) allegation was based on a report that Mother left Mia with two "random" people living in an apartment complex, both of whom have open "CPS" cases, and one of whom has a substance abuse history and "substantiated sexual abuse allegations."  The reporting party, a person living in the same apartment complex, took Mia and Mother into her home after seeing them standing in the rain.  Mother left Mia with the reporting party for three days without provisions, clothing or food, and did not visit despite saying she would.  The reporting party relayed that Mother was using drugs, homeless, and trying to get into a

2

drug treatment program. At the detention hearing on December 13, 2018, the juvenile court ordered that the child be detained.

The Agency filed a report prior to the jurisdiction and disposition hearing stating, among other things, that Mother reported being introduced to drugs when she was seven years old. Mother admitted abusing substances such as alcohol, marijuana, and methamphetamine by the time she was 12 years old until she became pregnant with Mia, at which point she enrolled in an inpatient treatment program where she stayed until she relapsed.

At the jurisdiction and disposition hearing in late February 2019, the parents submitted to amended allegations. The juvenile court found true allegations under section 300(b) that Mother has mental health and substance abuse issues that require assessment and treatment. The court also found true the allegation under section 300, subdivision (g), that the alleged father's ability to supervise and care for Mia was unknown. The court ordered reunification services and visitation for Mother. Mother agreed to the following five service requirements: (1) to participate in weekly individual therapy and work on developing a plan to manage her depression, and to address her substance abuse issues and their impact on her daughter; (2) to work with a mental health provider to ensure she is medication compliant; (3) to complete a substance abuse assessment and follow its recommendations; (4) to complete an inpatient or outpatient substance abuse treatment program and follow all recommendations of the treatment provider; and (5) to participate in substance abuse testing and consistently test negative.

**B. Six-Month Status Review Report and Hearing**

The Agency's six-month status review report, filed in July 2019, recommended termination of reunification services and the setting of a

3

section 366.26 hearing. The report indicated Mother was living on the street as of mid-July 2019. Mother had only sporadic contact with Mia and missed multiple visits resulting in suspension of her visitation at the facility where visits were supposed to occur. The report also indicated Mother seldomly and inconsistently communicated with the Agency, and did not utilize the services offered to help her sobriety or support her mental health.

In November 2019, the Agency filed an addendum report, still recommending termination of reunification services. This report noted the assigned Agency protective services worker (PSW) asked Mother where she had been for the first six months of this case, and Mother responded she had been "deep in her addiction" and using heroin and methamphetamine in the Tenderloin, until she had a "spiritual awakening" in August. Mother was enrolled in a residential treatment program at Helen Vine from August to October 2019, where she completed 27 days in withdrawal management and attended counseling and Alcoholics Anonymous/Narcotics Anonymous meetings. Mother tested positive for THC, suboxone, and methamphetamine in early August, but tests performed from August 20 to October 10, 2019 were all negative. Mother's visits with Mia were reinstated on September 5, 2019, and Mother attended about 75 percent of her visits.

A contested six-month status review hearing was held in November 2019. The juvenile court found that the return of Mia to Mother posed a substantial risk of detriment to Mia and that the Agency made reasonable efforts to help Mother overcome the problems that led to Mia's removal. The court also found there was a substantial probability Mia would be returned to Mother within six months, and it continued Mother's services.

## C. 18-Month Status Review Report and Hearing

In January 2020, the Agency filed a status review report recommending termination of reunification services and the setting of a section 366.26 hearing. According to the report, after Mother's initial inactivity in this case, she enrolled in an inpatient program at Helen Vine from August 8 to October 8, 2019, then entered another inpatient program at Center Point but self-discharged on October 14. Mother then entered the outpatient program at Center Point on November 1, but self-discharged on December 6, 2019. From December 6 to December 20, Mother's whereabouts were unknown. On December 20, 2019, Mother began a residential treatment program at Casa Aviva. She tested positive for THC and methamphetamine on December 24, and positive for THC on December 31, 2019. On December 26, Mother told the Agency that she relapsed and used marijuana, methamphetamine, and alcohol about two weeks prior. As for Mia, her therapist diagnosed her with post-traumatic stress disorder (PTSD) based on frequent episodes of " 'emotional dysregulation, nightmares, and intrusions.' " Mia reportedly began having meltdowns after Mother told her that Mia would return to her care and have overnight visits soon. After visits were reinstated with Mother in early-September 2019, Mia's foster parent reported Mia was screaming in her sleep, having nightmares and tantrums, and behaving aggressively towards her foster parent. Mia's therapist reported Mia was agitated during visits with Mother.

The Agency filed an addendum in May 2020. The addendum indicated Mother completed the program at Casa Aviva in March 2020, immediately moved on to another program at Women's Hope, and tested negative for substances at all 28 tests done from January 7 to May 19, 2020. The report stated Mother was engaging with mental health services, had obtained a

sponsor and participated in weekly Narcotics Anonymous meetings, and had completed parenting and relapse prevention classes.

Meanwhile, Mia moved in with a foster-to-adopt family in mid-February 2020 after visiting with them since November 2019. She called her foster-to-adopt parents "mommy" and "daddy" and expressed wanting to stay with them forever. The foster parents reported after Mia had a visit with Mother, during which Mother told her that Mother had a new home and that Mia had a bed there, Mia had nightmares and kicked the walls so hard she left marks and had bruises despite wearing two pairs of socks. The foster parents reported Mia has to wear extra socks after visits with Mother due to nightmares and kicking the walls. They also reported that Mia pulls her hair and grinds her teeth, engages in abnormal eating patterns like guarding her food or over-indulging, and exhibits sexualized behavior when dancing, dressing, or engaging with male adults for the first time. With regard to in-person visits, the report stated "[o]n March 17, 2020, the shelter-in-place order was in effect and all in-person visits moved to virtual visits." In April 2020, Mia's therapist reported the nightmares stopped when in-person visits with Mother were suspended due to the shelter-in-place order. Mia's therapist also reported that, while Mia loves and is connected with Mother, she presents with a "low level of dysregulation" when Mother is in her life, and is more regulated and better able to express herself when Mother is not. In April and May 2020, Mia disclosed possible abuse that occurred while in her Mother's custody at the hands of an "Uncle Sammy."

The Agency's addendum continued to recommend termination of reunification services, explaining that while Mother was presently on the "upswing," it would not be in Mia's best interest to continue reunification services and keep her on Mother's " 'roller coaster' " of sobriety and relapse.

6

The Agency indicated that Mother had only begun to show behavioral changes mitigating the safety concerns that led to this dependency case.

In early June 2020, the 12-month status review hearing was continued to September 2020. Meanwhile, the Agency filed a request to change Mother's visitation order. The Agency indicated the court's prior visitation order provided for supervised visits for Mother, and the Agency was asking for the court to change that order to only virtual visits and telephone contact. The Agency provided two reasons for the request: first, Mia's aggression, dysregulation, and night terrors had lessened since the suspension of in-person visits with Mother due to the shelter-in-place order; and second, Mia's foster family had a family member with a pre-existing condition, and there were concerns about Mia contracting Covid-19 at Mother's residential treatment center. The juvenile court set the issue to be heard at the upcoming September 2020 status review hearing, but ordered in the meantime that the Agency explore transitioning back to in-person visits.

On August 20, 2020, Mother filed her own request to change her visitation, asking the court to order in-person visits because Mia was declining to participate in virtual visits and virtual dyadic therapy was less beneficial than in-person dyadic therapy. On September 11, 2020, the juvenile court heard and denied Mother's request, finding no evidence of changed circumstances or that such a change would be in the child's best interest. The court indicated the Agency should attempt to reschedule missed visits.

The Agency filed another addendum report in September 2020. The addendum indicated Mother remained at Women's Hope where she completed all groups and obtained numerous certificates for completing classes. All of Mother's random drug tests continued to yield negative

7

results.  Mother was set to complete a psychotropic medication evaluation on September 2, 2020.

With regard to Mia, the Agency reported she was doing 90 minutes of daily academic instruction with her foster parents and weekly virtual visits with Mother.  The Agency reported that Mia's tantrums, nightmares, and PTSD symptoms continued to decrease and that the pandemic has been a "settling and healing time" for her.  Mia continued to disclose past instances of neglect and abuse while in Mother's care, albeit with decreasing frequency.  Mia's therapist reported during one joint dyadic therapy session with Mother, Mia was more dysregulated and could not express herself.  The therapist also reported Mia had formed a deep bond and healthy attachment with her foster parents.  In July 2020, Mia reported she no longer wanted to visit with Mother, either in-person or virtually "because her mother hurts her," and she wanted to stay with her foster parents.  The Agency's assigned PSW—who had seen Mia act excited and express love and affection to Mother during a virtual visit in July—asked the child's therapist how to reconcile this behavior with her stated wish not to visit Mother anymore; the therapist said she did not believe Mia was really excited, and her behavior was driven by anxiety and trauma.  The therapist believed there is a lot of love between Mother and Mia, but opined that Mia gets anxious and has difficulty interacting with Mother because Mother neglected and hurt her.

The addendum report went on to state that the doctor who diagnosed Mia with PTSD reported Mia grew developmentally after visits with Mother became virtual.  A consulting doctor from the "Child Trauma Research Program" opined Mia has "a toxic attachment" to Mother.  The consulting doctor reported Mia's PTSD is associated with her viewing Mother as a source of danger to her well-being, and PTSD in the first three to five years of

8

life is associated with long-term biological, cognitive, and emotional difficulties. This consulting doctor noted Mia was pulling her hair, grinding her teeth, hoarding food, and showing an inability to learn when overwhelmed by emotions related to Mother. This consulting doctor opined that returning Mia to Mother posed a very significant danger to Mia's present and future mental health.

At the contested "12/18-month" status review hearing held on September 23, 2020, the juvenile court heard testimony from the assigned Agency PSW and from Mother herself. The court received into evidence the Agency's January 2020 status review report, the May 2020 and September 2020 addendum reports, a letter from a psychiatrist who completed a medication evaluation for Mother, and a letter from Mother's therapist. Before making all its findings, the court acknowledged Mother was presently demonstrating significant progress in resolving some of the problems that led to Mia's removal. But the court also indicated that Mother still had a lot of work to do in terms of her own recovery and that Mia has intense daily needs. Ultimately, the court found that Mia's return to Mother would pose a substantial risk of detriment to Mia and a substantial danger to Mia's physical health. The court also determined by clear and convincing evidence that there was no substantial probability Mia would be returned in the time allowed by law and that the Agency had provided Mother reasonable services. The court terminated reunification services and set the matter for a section 366.26 hearing. The court also granted the Agency's request for no more in-person visits, and again denied Mother's request for in-person visits.

Mother filed this writ petition and requested a stay of the pending section 366.26 hearing. This court issued an order to show cause why the petition should not be granted.

DISCUSSION

## A. Substantial Probability of Return

We first address Mother's contention that the juvenile court erred in finding no substantial probability that Mia would be returned within the 24-month review period.

In this case, the status review hearing occurred 21 months after Mia was initially removed from Mother's custody. As such, the hearing became the 18-month hearing. (*Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1508–1509, superseded by statute on other grounds as stated in *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1504.) At the 18-month hearing, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).)

Section 366.22, subdivision (b) ("366.22(b)") provides narrow exceptions to the required setting of a section 366.26 hearing. As relevant here, section 366.22(b) provides "[i]f the child is not returned to a parent . . . and the court determines by *clear and convincing evidence that the best interests of the child would be met by the provision of additional reunification services* to a parent . . . *who is making significant and consistent progress in a court-ordered residential substance abuse treatment program*, . . . the court may continue the case for up to six months for a subsequent permanency review hearing, provided that the hearing shall occur within 24 months of the date the child was originally taken from the physical custody of his or her parent . . . . The court shall continue the case *only if it finds that there is a*

*substantial probability that the child will be returned to the physical custody of his or her parent . . . and safely maintained in the home within the extended period of time* or that reasonable services have not been provided to the parent." (Italics added.) To find a "substantial probability that the child will be returned to the physical custody of his or her parent . . . and safely maintained in the home within the extended period of time," the court must find the following three criteria satisfied: (1) the parent consistently and regularly contacted and visited the child; (2) the parent made significant and consistent progress in the prior 18 months in resolving the problems that led to the child's removal; and (3) the parent "demonstrated the capacity and ability both to complete the objectives of his or her substance abuse treatment plan as evidenced by reports from a substance abuse provider as applicable . . . and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.22(b)(1)–(3).)

"We review an order terminating reunification services to determine if it is supported by substantial evidence. [Citation.] In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the [lower] court.' " (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.)

Initially, we note the portion of Mother's memorandum setting out her argument concerning application of the aforementioned exception contains no record citations. This is a violation of rule 8.452, which specifies the content requirements for the type of extraordinary writ petition presented here and provides: "The memorandum must support *any* reference to a matter in the

11

record by a citation to the record." (Rule 8.452(b)(3), italics added.) We are not required to scour through different portions of the memorandum and the record to try and guess at what Mother might be relying on. (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239 & fn. 16.)

Even if we set aside the briefing omissions, a threshold problem is evident. The exception Mother invokes in section 366.22(b) has two requirements: (1) the court must determine by clear and convincing evidence that the best interests of the child would be met by the provision of additional reunification services to a parent who is making significant and consistent progress in a court-ordered residential substance abuse treatment program; and (2) the court must find a substantial probability that the child will be returned to the physical custody of her parent and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent. (§ 366.22(b).) Mother's contentions, however, only challenge the court's findings as to the latter requirement, not the former. This is dispositive. Without challenging the court's determination as to the aforementioned first requirement, Mother's argument that she satisfied the other requirement for application of the exception is of no moment. The requirements, while related, are not merely redundant such that we can simply read Mother's arguments about one as an argument about the other, and we are not required to make guesses at what arguments parties could have made. (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.)

Moreover, the aforementioned first requirement appears to require that a parent be participating in a court-ordered residential substance abuse program at the time of the hearing. Here, however, Mother was not doing so at the time of the hearing. Mother had graduated from an inpatient program

12

about two weeks before the hearing. At the status review hearing, Mother testified she would be moving into transitional housing at Jelani House in about a week and a half and she planned to participate in outpatient programs there.

All that being said, even assuming Mother could satisfy all aspects of the exception's first requirement, substantial evidence supports the juvenile court's finding on its second requirement of no substantial probability that Mia would be returned to Mother within the extended period of time.

As stated, a finding of substantial probability under section 366.22(b) requires a court to find, in part, that Mother "demonstrated the capacity and ability . . . to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.22(b)(3)(A).) Here, substantial evidence supports the juvenile court's implicit determination that Mother had not demonstrated the capacity and ability to provide for Mia's safety, protection, physical and emotional well-being, and special needs.

The record reflects Mother has a long history of substance abuse dating back to her teen years up to the time she became pregnant with Mia. Mother was "deep in her addiction" and essentially uninvolved in the case until August 2019, about eight months after Mia was detained. She relapsed in December 2019, but by January 2020 and continuing to the hearing in September 2020 she made progress towards completing what her case plan required of her, e.g., she completed inpatient substance abuse programs and engaged in mental health treatment. Mother planned to begin living in transitional housing after the status review hearing, where she would participate in various programs, begin to look for stable housing, and establish a means to support herself.

13

This period of sobriety and progress is commendable, but by the time of the status review hearing at 21 months, Mia was still just four years old and diagnosed with PTSD due to Mother's treatment of her. The Agency reports indicated that Mia became dysregulated when in close proximity to Mother. For instance, after visits were reinstated with Mother in early-September 2019, Mia began screaming in her sleep, having nightmares and tantrums, and behaving aggressively towards her foster parent. Mia had meltdowns after Mother told her they would have overnight visits soon. After one visit with Mother, Mia had nightmares during which she kicked the walls so hard she left marks and had bruises despite wearing two pairs of socks. The foster parents reported that Mia has to wear extra socks after visits with Mother due to nightmares and kicking the walls. They also reported that Mia pulls her hair, grinds her teeth, and exhibits abnormal eating patterns like guarding her food or over-indulging. Per Mia's therapist, the nightmares stopped when in-person visits with Mother were suspended due to the shelter-in-place order. Mental health providers working on Mia's case indicated that Mother is a source of anxiety and fear for the child. At the hearing, the Agency PSW testified, in line with statements made by the de facto parents, that Mia needs constant supervision, emotional coaching, and daily support to maintain age-appropriate academic skills.

Considering the evidence, especially the recency of Mother's sobriety and the intensity of Mia's emotional and other special needs, we conclude the record contains substantial evidence that Mother had not demonstrated "the capacity and ability . . . to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.22(b)(3)(A).) Having reached this conclusion, we need not and so do not address the other statutory requirements for finding a "substantial probability that the child

14

will be returned to the physical custody of his or her parent . . . and safely maintained in the home within the extended period of time." (§ 366.22(b)(1)–(3).)

The juvenile court did not err in finding no substantial probability that Mia would be returned within the 24-month review period.

## B. Reasonable Services

Next, we address Mother's argument the juvenile court erred in finding that Mother received reasonable services. Specifically, she contends she did not receive reasonable services because (1) the Agency changed her visits from in-person to virtual visits after the pandemic-related shelter-in-place order, and (2) the Agency improperly delegated to Mia the decision whether these virtual visits occurred or not.

At the 18-month review hearing, the juvenile court is required to determine whether reasonable services were offered or provided to the parent. (§ 366.22, subd. (a)(3).) "[W]here 'a timely challenge to the adequacy of services for the statutorily required minimum period . . . is sustained, that failure to provide services will justify the extension of services beyond 18 months, even without a showing of best interests of the child or substantial probability of return, and even if the permanent plan is not to return the child to the parent.' " (*Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 678; cf. *In re M.F.* (2019) 32 Cal.App.5th 1, 19 [" 'to meet due process requirements at the termination stage, the court must be satisfied reasonable services have been offered during the reunification stage' "].) With regard to reasonable services, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to

assist the parents in areas where compliance proved difficult (such as helping to provide transportation and offering more intensive rehabilitation services where others have failed)." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) We review a court's reasonable-services finding for substantial evidence. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)[2]

As before, we note Mother's contention on this point in the memorandum accompanying her writ petition is unsupported by record citations in violation of rule 8.452(b)(3). In any event, having reviewed the record, we conclude it "contains substantial evidence from which a reasonable fact finder could have found it highly probable that" reasonable services were provided. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1011.) Mother was provided many services to enable her to overcome the problems that led to the loss of custody of Mia, such as mental health and drug treatment services. Aside from the *type* of visits between her and Mia—i.e., virtual visits which the Agency began providing in March 2020 due to the pandemic and shelter-in-place order—Mother does not claim the Agency's provision of services was deficient.

---

[2]     Section 366.22, subdivision (a)(3), does not say the finding of reasonable services at the 18-month hearing must be made by clear and convincing evidence (see Evid. Code, § 115), and Mother relies on cases applying a preponderance of the evidence standard (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 594). Recent case law, however, indicates the reasonable-services finding must be made by clear and convincing evidence. (*In re M.F.*, *supra*, 32 Cal.App.5th at p. 14, citing §§ 366.21, subd. (g)(1)(C)(ii), and 366.22(b)(3)(C).) Even though the parties do not dispute application of the preponderance of the evidence standard of proof, we shall, in an abundance of caution, conduct our review bearing in mind the heightened clear and convincing standard. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

Visitation is " 'an essential component of a reunification plan' " (*In re T.M.* (2016) 4 Cal.App.5th 1214, 1218), and the record clearly and convincingly establishes that Mother was consistently provided visitation. Mother had the opportunity for in-person visits from December 2018 to March 2020, a large part of this case.[3]  And while virtual visits might not be the ideal type of visitation for a parent in Mother's situation, or qualitatively equivalent to in-person visits as Mother alleges, serious pandemic-related concerns and, as discussed more below, Mia's severe behavioral issues provided reasonable justification for the Agency's decision to allow only virtual visits.  In any event, case law does not require that the "best" services be provided:  "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.*, *supra*, 2 Cal.App.4th at p. 547.)

Mother's contention that the Agency improperly delegated to Mia the decision whether these virtual visits occurred is unsupported.  The Agency's May 2020 addendum report does not indicate Mia missed any virtual visits from March (when virtual visits began) to May 21, 2020 (the date the authoring PSW signed the addendum report).  The Agency's September 2020 addendum report shows that from May 21 to September 1, 2020 (roughly 14 weeks), there were 32 scheduled visits.  Of these 32 visits, the Agency

---

[3]     The jurisdiction/disposition report indicates Mother did not visit with Mia during the early part of this case despite the order permitting supervised in-person visits.  In early 2019, the Agency scheduled visits twice a week until visits were suspended in April 2019, per the visitation facility's policy, because Mother was missing them.  When visits were reinstated in September 2019, up to when the pandemic occurred, Mother was again provided in-person visits twice a week.

17

reported Mia participated in 26 of them. Of the cancelled visits, one was cancelled by the Mia's therapist and, for the remainder, Mia refused to participate or to make them up. The report also indicates sometimes Mia would end visits after anywhere from 10 to 60 minutes. At the status review hearing, Mother testified she thought that Mia missed "a little over ten [visits]." There were no follow up-questions to Mother to bring out further details to substantiate this number or the reasons for any of these missed visits.

Regardless of Mia's refusal to participate in some of the scheduled virtual visits, or her ending visits earlier than the allotted time, there is nothing in the record indicating that the Agency allowed Mia's mere wishes control whether the visits occurred. To the contrary, the September 2020 addendum report indicates the assigned Agency PSW considered and continued to assess the possibility of in-person visits between Mother and Mia, and her assessment included consideration of Mia's mental health and the negative effects of contact with Mother on the child. Furthermore, the record establishes that Mia's foster parents, her therapist, and Agency staff all encouraged Mia to participate in virtual visits, and this was so despite her reporting she did not want to participate, and despite her exhibiting mental health issues around the time of the visits. At the status review hearing, the Agency PSW testified that Mia consistently asserted she did not want to participate in any visits with Mother, yet she had participated in a virtual visit the Thursday prior to the hearing. The fact Mia participated in the vast majority of the virtual visits evidences that her desire not to visit with Mother did not control whether visits occurred or not.

Ultimately, we conclude "the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly

18

probable" that the Agency provided Mother reasonable services. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1011.)

## C. Modification of Visitation

Finally, we address Mother's contention that the juvenile court abused its discretion by granting the Agency's section 388 motion to change visits to virtual visits, and by denying her competing section 388 motion for in-person visits.

Briefly, the relevant facts are these. In June 2020, the Agency filed a request to modify the juvenile court's original December 13, 2018 visitation order, which permitted supervised visits for Mother, to an order for no in-person visits, just virtual visits and telephone contact. On June 25, 2020, the court deferred consideration of the Agency's request until the September 2020 status review hearing. In the meantime, however, it ordered the Agency explore transitioning back to in-person visits subject to 72 hours' notice to Mia's counsel.

In August 2020, Mother filed her own request asking the court to change the foregoing order giving the Agency discretion to transition back to in-person visits with 72 hours' notice to Mia's counsel, to an order for in-person visits. On September 11, 2020, the juvenile court considered Mother's request. Mother's counsel asserted Mia had cancelled four visits since Mother had filed her request. Counsel for Mia responded that four-year-old Mia consistently stated she did not want in-person visits with Mother, that Mia gets anxious just discussing the possibility of seeing Mother, and that Mia had a history of issues and engaging in self-harming behavior after in-person visits such as banging her feet against the wall causing bruising. Moreover, Mother's written request for the change order did not clearly address how the change would be in the *child's* best interest, other than to

say generally that in-person visits would support "healing and bonding." Based on the evidence that Mia was exhibiting mental health issues due to visitation with Mother and the lack of evidence that Mother's request was in the child's best interest, the court denied Mother's request for in-person visits.

At the subsequent September 23, 2020 status review hearing, the juvenile court considered the Agency's request to end in-person visits and renewed consideration of Mother's request for in-person visits. The court ultimately granted the Agency's request and denied Mother's. Mother contends this was an abuse of discretion.

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) We review for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

As stated, the Agency and Mother filed competing requests regarding visitation. As discussed in prior sections of this opinion, at the September 2020 status review hearing, the court heard testimony from the assigned Agency PSW that Mia consistently reported she did not want to participate in visits and that she engaged in self-harm and exhibited mental health issues around the time of the visits. The evidence showed that in-person visits would not be in Mia's best interest, and the court's denial of Mother's request was well within the bounds of reason. (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319.)

20

**DISPOSITION**

The petition for extraordinary writ is denied on the merits. (See *Kowis v. Howard* (1992) 3 Cal.4th 888, 894.) The decision is final in this court immediately. (Rules 8.452(i) & 8.490(b)(2)(A).)

_____
Fujisaki, J.

WE CONCUR:


_____
Siggins, P. J.


_____
Petrou, J.


A161026